Rel: May 15, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

————————————————

## CL-2025-0846

————————————————

## N.V.

## v.

## M.C.M.

## Appeal from Russell Circuit Court
## (DR-24-183)

FRIDY, Judge.

N.V. ("the former wife") appeals from a judgment of the Russell Circuit Court ("the trial court") that dismissed her petition for a protection-from-abuse order ("the PFA petition") against M.C.M. ("the former husband") but included a mutual no-contact provision. For the

reasons set forth herein, we affirm the judgment in part and reverse it in part.

<u>Background</u>

The parties divorced in February 2005. At that time, they had two minor children ("the children"). In November 2008, the trial court entered an order mutually enjoining the parties from threatening to commit or committing any of the acts of abuse defined in the Protection from Abuse Act ("the PFA Act"), § 30-5-1 et seq. Ala. Code 1975, and mutually prohibiting them from contacting each other, except for legitimate communication regarding the children. On March 30, 2011, the trial court entered a custody-modification order, pursuant to which it awarded the former wife "primary physical custody" of the children and awarded the former husband unsupervised visitation with the children during the day but required him to exercise his overnight visitation at the children's paternal grandparents' home.

On November 19, 2024, the former wife commenced the underlying action against the former husband ("the PFA action") by filing the PFA petition. In the PFA petition, the former wife alleged that the former husband had been harassing her, threatening her, and coming onto her

property. On November 25, 2024, the trial court entered an ex parte protection order that, among other things, restrained the former husband from having any contact with the former wife; from threatening to commit or committing any acts of abuse against the former wife; and from harassing, annoying, stalking, threatening, or engaging in conduct that would place the former wife in reasonable fear of physical bodily injury or emotional apprehension. The trial court also directed the former husband to stay at least 750 feet away from the former wife.

On December 9, 2024, the former husband wrote a letter to the trial court complaining that the former wife had misrepresented what he said was his right to unsupervised visitation with the parties' sixteen-year-old son ("the son"). In the letter, the former husband asserted that the former wife had used a false warrant to have him arrested on charges of domestic violence and criminal trespass and that she had used those charges to interfere with his visitation with the son. (The parties' older child had reached the age of majority when the former wife filed the PFA petition.) The trial court construed the letter as a motion for a protective order.

3

In response, the former wife wrote a letter to the trial court on December 12, 2024, asking that it "put something in place" regarding the former husband's visitation with the son because, she said, she did not believe that the son was safe with the former husband. The next day, she wrote the trial court an additional letter saying that "a lot of things were missed" in the PFA petition that she had filed and that she wanted to file more paperwork in the PFA action. She reiterated that she was scared for herself and the son.

On February 4, 2025, the former wife filed a motion to consolidate the PFA action with the existing 2003 domestic-relations case involving their divorce and postdivorce proceedings that reflected what she described as "a long history of abuse and contention between the parties," adding that access to the information contained in the domestic-relations case "would be beneficial to the court." The trial court denied the request on the ground that the domestic-relations case and the PFA action did not arise out of a common set of facts.

The former wife and the former husband appeared pro se before the trial court for a trial on August 7, 2025. At the trial, the former wife testified that she already had six protection orders or restraining orders

against the former husband and that she was seeking the current PFA order because, in August 2024, despite the existence of a no-contact order that the trial court had entered previously, the former husband began harassing her. She said that she had told him not to come onto her property and had reminded him of the no-contact order. Nonetheless, the former wife said, the former husband had been coming to her house while she was asleep, "cussing" the son and smoking a marijuana cigarette on her front porch. Because of the former husband's past conduct, the former wife said, she was afraid.

After the trial-court judge explained to her that any new PFA order had to be based on "solid, credible, relevant evidence" of the former husband's current conduct that would warrant such an order, the former wife testified that, in October 2024, the former husband came to her house and told her that, as long as the son was there, he was not going to stop coming over. She said that he told her: "'I got you. You got it coming.'" When the former husband left her house, the former wife said, she called emergency 911.

The former wife then submitted a video recording, which was played in open court, during which the following conversation took place:

"(AUDIO BEING PLAYED)

"'FEMALE: (Unintelligible) No, I'm done with you. Get your ass off my property. Do not come back. You are rude as hell. You fucking harass me. You threaten me.

"'MALE: You're throwing away money on that car.

"'FEMALE: You threaten me.

"'MALE: I bought that car. I bought --

"'FEMALE: Get the fuck off my property.'

"THE COURT: Oh, come on. Is that you?

"(AUDIO BEING PLAYED)

"'FEMALE: Get off of my property.'

"THE COURT: Is that you?

"(AUDIO BEING PLAYED)

"'FEMALE: I'm tired of telling you, get off my property.'

"THE COURT: Is that you?

"[FORMER WIFE]: I had been telling him for like two months not to come on my property.

"THE COURT: Is that you cursing at him, telling him to get the fuck off the property and all that kind of stuff?

"(AUDIO BEING PLAYED)

"'FEMALE: Get off my property.'

6

"THE COURT: You don't appear to be afraid of him. You are yelling at him.

"(AUDIO BEING PLAYED)

"'FEMALE: I'm tired of telling you.

"'MALE: Let me pull my car (unintelligible).

"'FEMALE: Get off my property. Get off --'

"(END OF AUDIO)

"THE COURT: Oh, come on. This is crazy."

After asking the former wife some additional questions, the trial-court judge said:

"I heard the video. Just for the record, I heard the video. You did not appear to be afraid of him in that video. You did not -- there was nothing that would let -- hang on a second. There was nothing in that video that led me to believe that you were even concerned or afraid. If he said that I'm going to kill you or whatever, you clapped back at him and you were aggressive. He was walking away and you were still cursing him out, cursing him out, cursing him out, being aggressive. There was nothing in that video that you could say -- listen, ma'am. Because I try to give people their time in court. I don't want anybody accu -- but we can't -- this is precious time. This is precious time. There are people out there literally, you know, some stuff is really going on, and -- all right."

The former husband testified that, before November 2024, he had been going to the former wife's house almost every week to see her and

that they had grilled out together and had eaten dinner together. Then, in October or November 2024, he said, the former wife had him put in jail pursuant to an old protective order. The former wife conceded that, earlier in 2024, the former husband had brought food to her after she had had surgery and was unable to walk.

After the trial-court judge established that, as of the day of the trial, the former husband had no reason to be on the former wife's property, the trial-court judge told them that he was going to enter a mutual no-contact order between them. Otherwise, he said, he was not going to enter a protection order. The trial-court judge also explained to the parties that he did not believe this matter rose to the level of a PFA action.

The former wife convinced the trial-court judge to watch more video clips, which continued in the same vein as the previous clip already set forth, after which the trial-court judge said to the former wife:

> "But you are the one that's saying, go ahead, do something. Now, that's threatening because -- because you invited -- hold on a second. Hold on a second. And then after that he says, you got it coming to you, girl.

> "So let me tell you how I interpret that. You're saying, you know, go ahead, do something. What you're going to do is taunting -- no, it's taunting."

8

When the former wife continued to complain to the trial-court judge about the former husband's behavior, the trial-court judge told her that, from watching the video, an argument could be made that she had started the trouble between them and that it was the trial-court judge's opinion that she had started it. At the close of the trial, the trial-court judge told the former wife that she had failed to meet her burden to warrant a PFA order.

On August 7, 2025, the trial court entered a judgment in which it found that

> "the video clearly shows the [former wife] as more the aggressor/tantalizer [sic] in the altercation. Yes, the [former husband] said some things that could marginally be construed as threatening. But it was nothing worse than what the [former wife] herself had said.
>
> "There was nothing in that video that suggests the [former husband] was a threat to harm or danger to the [former wife]. In fact, the [former husband] retreated from the home and the [former wife] continued to curse the former husband]."

In the judgment, the trial court wrote that it would "enter a mutual no contact order between the parties and they are not allowed to contact one another or go on the other's property for any reason. This matter is

hereby DISMISSED subject to the NO CONTACT ORDERS of this Court."[1] (Capitalization in original.)

On August 11, 2025, the trial court entered a separate order denying the former wife's motion for a protective order. On September 5, 2025, the former wife filed a motion to alter, amend, or vacate the judgment, which the trial court denied on September 10, 2025. The former wife appeals from the judgment dismissing the PFA action.

Analysis

As she did in her postjudgment motion, the former wife contends that the trial court did not have the authority to enter a mutual no-contact order. In support of her contention, the former wife relies on § 30-5-5(d), Ala. Code 1975, a section of the PFA Act, which provides: "The court shall not enter mutual orders. The court shall issue separate orders that specifically and independently state the prohibited behavior and relief granted in order to protect the victim and the victim's immediate family and to clearly provide law enforcement with sufficient directives."

---

[1]Although the record does not contain the separate mutual no-contact order that the trial court indicated it intended to enter, the judgment's direction that the parties were "not allowed to contact one another" was sufficient to impose a mutual no-contact order on the parties.

10

Our research has revealed only one case pertaining to § 30-5-5(d) and a trial court's entry of a mutual no-contact order. In T.K. v. B.K., 332 So. 3d 436 (Ala. Civ. App. 2021), the husband challenged a PFA order, arguing that the parties had agreed to the entry of a mutual no-contact order, as opposed to a PFA order. In a footnote, this court observed that, in the context of a PFA action, § 30-5-5(d) prohibits the entry of mutual orders, and, as a result, we held that, "under [§ 30-5-5(d)], the trial court cannot enter a mutual order regardless of the parties' oral agreement." Id. at 437 n.1. The mutual no-contact provision contained in the judgment in this case is indistinguishable from a mutual no-contact order, which, as this court admonished in T.K., is not permitted under the PFA Act; therefore, that portion of the trial court's judgment instructing the parties that they "are not allowed to contact one another or go on the other's property for any reason" is due to be reversed.

As part of her contention that the trial court did not have the authority to enter a mutual no-contact order, the former wife argues that she submitted sufficient evidence to the trial court to warrant a judgment in her favor. To support her position, she argues that the evidence showed

11

that, at the very least, the former husband had criminally trespassed on her property.

Because the trial court received evidence ore tenus, including a video recording of the harassment that the former wife said the former husband had committed against her, its findings of fact based on the evidence "are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust." Philpot v. State, 843 So. 2d 122, 125 (Ala. 2002). See also P.T.S. v. S.S., 406 So. 3d 109, 113 (Ala. Civ. App. 2024). Here, the trial-court judge explained to the former wife that, after watching the video, he believed that the former wife had essentially goaded the former husband into saying that she was going to get what was coming to her, that she had been the aggressor and antagonist in this case, and that this case did not rise to the level of a PFA action. Based on our review of the record, including the transcript of the audio portion of the video that was submitted into evidence, we cannot say that the trial court's judgment denying the former wife the PFA order that she requested is plainly and palpably wrong or manifestly unjust. Therefore, to the extent that the

12

judgment denies the relief that the former wife requested, the judgment is affirmed.

Conclusion

For the reasons explained herein, the trial court erred in including a mutual no-contact provision in the judgment; therefore, that provision of the judgment is reversed. However, insofar as the judgment determined that the former wife failed to prove that she is entitled to a PFA order, the judgment is affirmed. The case is remanded to the trial court for the entry of a judgment consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Edwards, Hanson, and Bowden, JJ., concur.